COFFIN
v.
HENSHAW.

*Saturday,*
*May 29.*

*Saturday,*
*May 29.*

------

COFFIN and Others *v.* HENSHAW.

*A.* sent money to a bank in the form of a draft, with directions to place it to his credit and await his further orders. The banking firm gave a receipt for the same. Afterwards *A.* agreed with *B.* that the draft should be transferred to *B.'s* credit; but the firm was not privy to the agreement, nor did *A.* notify them of it, or make any order in pursuance of it. *B.*, however, without authority from *A.*, wrote to the firm ordering them to place the draft to his credit, and was answered that they had done so. Afterwards, *A.* demanded the money, and the firm refusing to pay it, he brought suit. *Held,* that the firm was liable to *A.* for the amount of the draft.

May Term,
1858.

COFFIN
v.
HENSHAW.

Monday,
May 31.

APPEAL from the *Wayne* Circuit Court.

WORDEN, J.—This was an action by the appellee against the appellant and others, composing the firm of *Cooper, Lippencott, Coffin, & Co.*, for money had and received by the defendants below, for the use of the plaintiff below.

Process was served on *Coffin*, and a suggestion of not found was entered as to the others. *Coffin*, only, appeared to the action, and judgment was rendered against him only.

The complaint alleges that on the 11th of *December*, 1854, the defendants, by their receipt in writing, acknowledged to one *John Peele*, by the name of *J. Peele*, the agent of the plaintiff, the receipt of a draft on the *Merchant's Bank*, of *New York*, calling for 597 dollars, 29 cents, payable to one *Cox*, and by him indorsed to the plaintiff, to whose credit it was placed by the defendant, as so much money had and received to the plaintiff's use; that the defendants received said sum of money from said bank for the use of the plaintiff, and that the same was duly demanded of the defendants before the commencement of this suit, and payment refused.

The receipt above mentioned is set out as follows, viz.:

"*Phil.*, Dec. 11, 1854.

Mr. *J. Peele:*   Yours of *Nov.* 31 last, came to hand in due time, with the draft enclosed on *Merchant's Bank of New York*, calling for 597 dollars 29 cents, payable to *R. W. Cox*, with instructions to place the same to the credit of *Nathan Henshaw*, of *Indiana*, which amount has been placed to his order, &c.   Yours truly, [Signed,]

*Cooper, Lippencott, Coffin, & Co.*"

The defendant *Coffin*, for answer, denied all the matters set up in the complaint.

The cause was tried by the Court, which found for the plaintiff the sum of 522 dollars 15 cents. Motion for new trial overruled, and judgment on the finding. Bill of exceptions filed setting out the evidence.

The reasons filed for a new trial were—

"1. The finding for the plaintiff is contrary to law.

" 2. The said finding is against the evidence and not sustained by it."

It appears from the testimony, that *Henshaw* was entitled to about 600 dollars in the state of *North Carolina*, as the guardian of one *Amos R. Peele*, and that the above-named *John Peele*, as agent of said *Amos R.*, and by the direction of *Henshaw*, as acting guardian of said *Amos R.*, with said money procured the draft in question for 597 dollars 29 cents, payable to one *R. H. Cox*, and by him indorsed to the said firm of *Cooper, Lippencott, Coffin, & Co.*; and that on the 31st of *November*, 1854, the said *John Peele* transmitted the said draft to the said firm, writing them that he sent the draft by the instructions of said *Henshaw*, with directions to place the amount thereof to his credit, and wait his further orders, and that he received from them the receipt above set out.

In *April*, 1855, *Henshaw* gave an order on defendants to one *Joel Parker*, for the amount of said draft, less 100 dollars, which had been arranged in some other way, payment of which order was refused by defendants.

The execution of the above receipt by defendants was proven, and the names of the firm admitted.

This is the substance of the testimony for the plaintiff.

On the other hand, it was proven by one *Nathan Stanton*, that in the spring or fore part of the summer of 1854, *Henshaw* came to him, *Stanton*, and stated that he had 600 dollars in *North Carolina*, as guardian of *Amos R. Peele*, and that he wanted to use some of the money in the purchase of land, and that if he, *Stanton*, would agree to pay him 300 dollars when the man came of whom he expected to buy the land, he, *Henshaw*, would let him, *Stanton*, have a check for 600 dollars from *North Carolina* on some eastern bank.

The arrangement was accordingly made. The other three hundred dollars was to be paid at some future time, which was not definitely agreed upon. *Stanton* then gave *Henshaw* the name of the firm of *Cooper, Lippencott, Coffin, & Co.*, as the persons for his agent to send the check to, and directed him to have it made payable to them. He

then wrote said firm stating that they would receive a check for 600 dollars from *North Carolina* from *N. Henshaw*, which was to be placed to his, *Stanton's*, credit.

The man of whom *Henshaw* expected to purchase land did not come, and *Stanton* was not pressed for the 300 dollars (which has never been paid), but *Henshaw* demanded it about the time it was to have been paid, and several times afterwards. In the winter afterwards, *Stanton* paid *Henshaw* 100 dollars on the check and gave him claims to a considerable amount on persons in his neighborhood, requesting him to make what collections he could and retain it on the check. Some time in the latter part of the summer or first of the fall of 1854, *Stanton* received information from said firm that they had received said check for 600 dollars and placed it to his credit. That he was credited by said firm (to whom he appears to have been indebted), with the said sum of 600 dollars in the latter part of the summer or fore part of the fall of 1854. It was the understanding of *Stanton*, that the check spoken of, when received by said firm, was to be at his disposal, and that he was to become paymaster to *Henshaw* for the same. The following receipt was given by *Henshaw* to *Stanton* on the payment of the 100 dollars before spoken of, viz.:

"Received of *Nathan Stanton* one hundred dollars to his credit on a check sent by my direction to *Cooper, Lippencott, Coffin, & Co.*, of *Philadelphia*, 1st mo. 15th, 1855.

*Nathan Henshaw.*"

*Henshaw* never authorized *Stanton* to write to said firm to place said check or draft to his *Stanton's* credit, nor does it appear that ever *Henshaw* authorized them to do so, or had any conversation, or made any arrangement with them on the subject. *Stanton* says there was no other agreement between him and *Henshaw* than the one before mentioned as having been made in the spring or fore part of the summer of 1854.

It appears that in a conversation between *Henshaw* and *Stanton*, *Henshaw* told *Stanton* that the check was received by said firm and placed to his, *Henshaw's*, credit, and when *Stanton* paid him, it was to be placed to *Stanton's* credit;

and he asked *Stanton* what would be done, as he, *Stanton*, could not raise the money, and that *Stanton* replied, in substance (with that view of the matter), that he, *Henshaw*, should send to the firm and get the balance, having received 100 dollars. This conversation took place between the middle of *January* and *February*, 1855.

May Term, 1858.

COFFIN
v.
HENSHAW.

*Stanton* failed in *February*, 1855, and there was testimony having a tendency to show that for a year or more before that, *Henshaw* distrusted his solvency.

An effort was made to impeach the testimony of *Stanton*, but that was mostly if not totally a failure.

The above are believed to be all the material facts involved in the case.

There is no question made as to the draft named, being received by *Cooper, Lippencott, Coffin, & Co.* as money, and treated as such by them, and of course we raise none in that respect.

It is insisted, however, that, under the facts disclosed by the testimony, the firm, upon the receipt of the draft, became the debtors of *Stanton* and not of *Henshaw*, and that they are not liable to *Henshaw;* that the draft really belonged to *Stanton*, by virtue of the agreement between him and *Henshaw*. But we do not think the evidence sustains this position.

The money belonged to *Henshaw*, in his fiduciary capacity, and it was sent to the firm, in the form of the draft, with directions to place it to his credit and await his further orders, which was done by the firm. As between *Henshaw* and the firm, there does not appear to have ever been any understanding that it should be placed to the credit of *Stanton*, nor did *Henshaw* ever authorize *Stanton* to direct the firm to place it to his credit.

These facts would, of course, make the firm liable to *Henshaw* for the draft, and we do not think that liability, at all affected by the fact that *Henshaw* had agreed with *Stanton* to let him have the draft, and that *Stanton* had furnished the name of the firm to whom the draft should be sent, and had written the firm advising them that they would receive the draft from *Henshaw*, to be placed to his,

*Stanton's,* credit. The real question is, to whom did the firm become indebted upon the receipt of the draft? Very clearly, to *Henshaw,* as it was received from him through *J. Peele,* by his direction, and placed to his credit. This liability of the firm to *Henshaw,* was not discharged by the agreement between *Henshaw* and *Stanton,* to which the firm was in nowise privy.

Upon the receipt of the draft by the firm, they became liable to only one of these persons for the amount of it. That liability was not to *Stanton,* as it belonged to *Henshaw* (the title not having passed by his agreement to let *Stanton* have it); it was received by the firm as *Henshaw's,* and he was credited with the amount of it.

In order to discharge the liability to *Henshaw,* there must have been some agreement, express or implied, that the firm should become debtor to *Stanton* instead of *Henshaw,* and that the credit should be transferred to *Stanton;* and this contract should be of such a character as to render the firm liable to *Stanton* for the draft.

No such agreement is shown to exist in the case. We regard as immaterial, the fact that the firm gave *Stanton* credit for the draft in the settlement of their claims against him, as it does not appear from the evidence that they had any authority from *Henshaw* to do so.

The finding appears to have been in accordance with the evidence, and the judgment must be affirmed.

*Per Curiam.*—The judgment is affirmed with costs.

*G. W. Julian* and *J. B. Julian,* for the appellants.

*J. Perry,* for the appellee.